**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-cr-136 (JMC)** |
| **v.** | : | |
| | : | |
| **STEVEN MILES,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Steven Miles to 30 months' incarceration, which is the top of the applicable Sentencing Guidelines range, followed by three years of supervised release. The government also requests that this Court impose $2,000 in restitution, consistent with the plea agreement, and the mandatory $100 special assessment.

## I.    INTRODUCTION

Defendant Steven Miles—a 40-year-old self-employed adult film actor and former Army soldier who lives in Zephyrhills, Florida— destroyed property and assaulted officers during the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States

Miles descended on the Capitol with his fellow Proud Boys, and knowingly entered the restricted grounds long before the "Stop the Steal" rally was over. He then joined the mob that stormed the police line on the West Plaza, where he shoved and tried to punch officers. When others created a breach in the police line, Miles took immediate advantage, running up the Capitol building's exterior stairs to reach the Upper West Terrace. There, Miles obtained a wooden plank from the inauguration construction site and used it to smash the window on the north side of the Senate Wing Door, creating one of the first breaches of the Capitol building. Miles then entered the Capitol building through that broken window. A flood of rioters followed him. Miles left the building soon after, exiting when he ran into a line of officers inside. Months later, when FBI agents arrested him, Miles agreed to be interviewed but then repeatedly and blatantly lied to the agents. Miles has never expressed remorse for his actions on January 6.

The government recommends that the Court sentence Miles to 30 months of incarceration, the high end of the applicable Sentencing Guidelines range, for his conviction for violating 18 U.S.C. § 111(a)(1). A 30-month sentence reflects the gravity of Miles's conduct, but also acknowledges his early admission of guilt and mitigating personal history.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case,

---

Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

ECF No. 52, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, disrupting the peaceful transfer of power after the November 3, 2020 presidential election.

**B.**      **Miles's Role in the January 6, 2021 Attack on the Capitol**

On January 5, 2021, Miles—a member of the Proud Boys—rented a car and drove from his home in Zephyrhills to Washington, D.C.

On the morning of January 6, 2021, Miles rendezvoused with a large group of Proud Boys near the Ellipse, including his co-defendant Matthew LeBrun. Miles was wearing a beige desert camouflage jacket, green jungle camouflage pants, and tan boots; he also wore a red "Make America Great Again" baseball hat, gloves, and a gray backpack. *See* Image 1.



*Image 1: Photograph showing Miles' attire on January 6, 2021*

The large group of Proud Boys did not stick around to listen to former President Trump's speech. Instead, they marched on the Capitol building *en masse*. As they organized, one of the leaders of the march, Ethan Nordean, gave a series of orders to the Proud Boys through a megaphone, including "slow and steady pace to the Capitol" and "develop that front line, get a move on."   As the group, which included Miles, marched down Constitution Avenue, they engaged in various chants and response calls, including "F*** Antifa!" and "Whose streets? Our streets!" As the group walked past the west side of the Capitol at approximately 11:20 a.m.—more

4

than an hour prior to the initial breach—one leader of the march, Nordean called out, "We represent the spirit of 1776. If you haven't noticed, real men are here. We know what the oath is [unintelligible] to support and defend the Constitution . . . Let us remind those who have forgotten what that means."

Miles walked with his jacket open, revealing a black t-shirt reading "TRUMP 2020 Fuck Your Feelings" underneath. *See* Image 2.



*Image 2: LeBrun and Miles marching with the group of Proud Boys down Constitution Ave. and toward the Capitol*

A few minutes later, as the group marched past U.S. Capitol Police (USCP) officers at approximately 11:28 a.m., another leader of the march, Joseph Biggs, gave the group of officers the middle finger, and the men marching with Biggs taunted them, yelling "treason," and warning the officers, "don't make us go against you." The marching group, including Miles, continued to the east side of the Capitol. As the group stood on the east side of the Capitol, a Proud Boys

member named Daniel Scott yelled out, "let's take the fucking Capitol." Scott was chastised and told not to "say" that.

The group of Proud Boys, including Miles, stopped at or around 12:15 p.m. near Second Street and Constitution Avenue, NW, near some food trucks. At approximately 12:45 p.m., fifteen minutes before the certification of the Electoral College vote was scheduled to start, Nordean mustered the men into a column and marched them back towards the Capitol, making their way to the west side of the outer secure perimeter surrounding the Capitol grounds on First Street, NW.

Miles and the marching group arrived at the Peace Circle, at the edge of the restricted portion of Capitol grounds, at approximately 12:50 p.m. Prior to their arrival, the Peace Circle was uncrowded and relatively peaceful. The First Street pedestrian entrance to the Capitol, which was approximately 100 feet away, was guarded by a handful of USCP officers. Prominent signs posted on metal barriers at the pedestrian entrance and other locations stated, "AREA CLOSED By order of the United States Capitol Police Board."

Upon arriving at the Peace Circle, Biggs led the crowd in chants that included "USA!," "Where's Antifa", and "Whose Capitol? Our Capitol!" At 12:53 p.m., approximately one minute after Biggs led the "Whose Capitol? Our Capitol!" chant, the crowd surged forward towards a police barricade. As the crowd surged forward, Nordean and Biggs attempted to organize the men to stay with and follow them. Miles joined in this effort. He later admitted that he knew he and his fellow Proud Boys lacked authority to be where they were, but none of that deterred him.

Police officers retreated from the gates near the Peace Monument and attempted to form a defensive line to stop the rioters from advancing to the building. The mob, led by members of the crowd, tore down a waist-high black metal fence on the West Plaza and surged forward again.

6

Miles paid no heed to the officers attempting to stop the mob. *See* Image 3.



*Image 3: LeBrun and Miles entering the West Plaza despite police officers' (circled in yellow) efforts to secure the area*

After penetrating deeper into the West Plaza, LeBrun, Miles, and other rioters engaged in a confrontation with riot gear-clad police officers who were protecting the Capitol. The confrontation began as a verbal argument and then escalated into a physical fight. During this confrontation, Miles shoved and attempted to punch police officers, as seen in Images 4 and 5.



*Image 4: Miles fighting with police officers*



*Image 5: Miles fighting with police officers*

The police officers used a variety of crowd control tactics, including spraying chemical

irritants, to try to contain and repel the rioters. Miles was affected by the chemical irritants, which

cause substantial pain and limited his vision, and he removed his mask and gaiter to splash water on his face in an attempt to deal with those effects. *See* Image 6.



*Image 6: Miles with his mask off, shortly after police sprayed him with a chemical irritant.*

LeBrun and Miles also assisted other rioters who had been sprayed by the police with chemical irritants, as shown in Image 7.



*Image 7: Lebrun and Miles helping a fellow rioter who appears to have been hit with a chemical irritant, which he is attempting to treat with a white opaque liquid, likely milk.*

Miles was not done. His worst and most violent offense came a short time later. After recovering from the chemical irritant, Miles pushed deeper into the West Plaza, further probing the police line and searching for ways to breach it.

Scaffolding had been erected near the northwest side of the Capitol as part of the ongoing construction of the stage and bleachers for the upcoming presidential inauguration. White plastic sheeting covered the scaffolding. At around the same time LeBrun and Miles reached the area of the scaffolding, other rioters slashed the canvas sheeting surrounding the scaffolding, which revealed a staircase under the scaffolding that led to the Upper West Terrace, an area that previously had been inaccessible to the rioters. The destruction of the canvas sheeting and attack of officers guarding the scaffolding (led by members of the Proud Boys) created a catastrophic breach, and Miles—along with many others—took advantage of it. Miles and LeBrun maneuvered their way through the crowd and under the scaffolding so that they could access that newly exposed staircase. *See* Image 8.



*Image 8: LeBrun and Miles (outlined in yellow) walking under the scaffolding and toward the staircase*

10

At approximately 2:10 p.m., LeBrun and Miles traveled up the staircase from the west front to the Upper West Terrace of the Capitol. *See* Image 9.



*Image 9: LeBrun and Miles ascending the exterior staircase to access the Upper West Terrace*

By approximately 2:12 p.m., rioters who had ascended to the Upper West Terrace were banging on the Senate Wing Door and the windows on either side of the door with their fists and blunt objects. Within one minute, fellow Proud Boys member Dominic Pezzola, who was convicted after trial in *United States v. Nordean, et al.*, 1:21-cr-175-TJK, successfully used a stolen U.S. Capitol Police riot shield to smash in the window on the south side of the Senate Wing Door.[2] Pezzola and many other rioters then unlawfully entered the U.S. Capitol Building. A handful of people entered the building through that broken window and opened the Senate Wing Door from the inside, paving the way for scores of additional rioters to breach the Capitol Building.

---

[2] *See video at* "Proud Boy who broke Capitol window: 'I got caught up in all the craziness,'" *available at:* https://www.washingtonpost.com/dc-md-va/2023/04/18/proud-boy-pezzola-testifies/                    (last accessed January 26, 2024)

Within two minutes of Pezzola breaking the window on the south side of the Senate Wing Door, Miles used a wooden board to help smash the window on the other side of it. Miles succeeded in breaking the window, opening up another breach of the Capitol building and another avenue for rioters to unlawfully enter it. *See* Image 10.



*Image 10: Miles using a wooden board to smash the window on the north side of the Senate Wing Door*

Miles then entered through the window he had helped to smash; he was the second person to enter the Capitol building through that broken window. *See* Image 11. LeBrun followed soon after.



*Image 11: Miles entering the Capitol building through the window he broke*

Rioters who participated in this breach – the very first breach, which Miles facilitated – would go on to chase Officer Eugene Goodman, storm the Senate Chamber, overrun a police line in the Crypt, and fan out across the Capitol, attacking officers, destroying property, nearly breaching the House Chamber while members sheltered inside, and disrupting the certification for hours.

Meanwhile, Miles and Lebrun briefly walked through the Capitol building. Immediately after entering, they turned toward the Senate. *See* Image 12.



*Image 12: Miles turning toward the Senate*

Miles and LeBrun soon encountered a police line, however, and were directed out of the

building. LeBrun and Miles then exited through the Senate Carriage Door, having spent a total of

approximately three minutes inside the Capitol building. *See* Image 13.



*Image 13: LeBrun and Miles exiting the Capitol building*

Later, while outside of the restricted Capitol grounds, LeBrun and Miles met another

liked-minded individual and posed for a photograph with him/her. The individual provided that

photograph, which appears below, to FBI agents and said that while talking to him/her, Miles

and LeBrun bragged that they had broken into and entered the Capitol building by breaking a

window.



*Image 14: LeBrun and Miles posed for photograph with an individual who overheard them
bragging about entering the Capitol illegally by breaking a window*

*Miles's Arrest and Interview*

Shortly after the government charged Miles by complaint, *see* ECF No. 1, FBI agents

conducted an arrest operation at Miles' residence, where he surrendered without incident. Miles

voluntarily waived his right to counsel and submitted to an interview. While Miles acted pleasant

and cooperative with the agents, he repeatedly lied to them. For example, Miles claimed he watched the speeches before walking to the Capitol building, but video and photographic evidence, including those referenced above, reveals that is false. Similarly, Miles stated that he was never violent with anyone, including the police, and that he only contacted officers when someone else pushed him into them. Exterior USCP surveillance video, as depicted above, shows that was a lie. Additionally, Miles asserted that he never entered the Capitol building, but interior USCP surveillance video establishes that was a lie too. After Miles identified himself in a series of photographs that the agents showed to him, Miles asked for an attorney. The agents ended the interview immediately.

## III.   THE CHARGES AND PLEA AGREEMENT

On April 20, 2022, a grand jury sitting in this District charged Miles by indictment with nine counts, including four felonies: violations of 18 U.S.C. § 231(a)(1) (Civil Disorder) (Count 1); 18 U.S.C. § 111(a)(1) (Assaulting, Resisting, or Impeding Certain Officers) (Count 2); 18 U.S.C. § 1361 (Destruction of Government Property) (Count 3); and 18 U.S.G. § 1752(a)(4) and (b)(1)(A) (Physical Violence in a Restricted Building or Grounds with a Dangerous or Deadly Weapon) (Count 6). On October 19, 2023, Miles was convicted of Count 3, the violation of 18 U.S.C. § 111(a)(1), based on a guilty plea entered pursuant to a plea agreement. *See* Minute Entry 10/19/2023; *see also* ECF Nos. 50-52.

## IV.   STATUTORY PENALTIES

Miles now faces sentencing on his felony conviction for Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation

Office ("the PSR"), Miles faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100. *See* ECF No. 51 ¶ 1; PSR ¶¶ 104, 111, 122, 126.

## V.  THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

Here, the government agrees with the Guidelines analysis and calculations in the PSR, which is consistent with the calculation in the plea agreement.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 is now in effect, but was not considered at the time the parties entered into the plea agreement.

Section 4C1.1 does not apply in this case, for multiple reasons. First, Miles used "violence or credible threats of violence in connection with the offense," (U.S.S.G. § 4C1.1(a)(3)), personally punching and shoving officers on the West Plaza, and smashing a window adjacent to the Senate Wing Door. Second, he possessed a dangerous weapon in connection with the offense

(U.S.S.G. § 4C1.1(a)(7)), as broadly defined in 1B1.1 cmt. n.1 and charged in Count 6, namely, a wooden plank. The government is aware of at least four cases in which courts have rejected the application of § 4C1.1 or declined to enter post-sentencing reductions under Section 3553(a) for January 6 defendants for similar reasons: *United States v. Gundersen*, 21-cr-137 (RC); *United States v. Baquero*, 21-cr-702 (JEB); *United States v. Dillard*, 23-cr-49 (JMC); and *United States v. Bauer,* 21-cr-382-2 (TNM).

The U.S. Probation Office calculated Miles's criminal history as category I, which is not disputed. PSR ¶ 57. Accordingly, based on the government's calculation of Miles's total adjusted offense level, after acceptance of responsibility, at 17, Miles's Guidelines imprisonment range is 24 to 30 months' imprisonment. Miles's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein. *See* ECF No. 51 ¶ 6.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a 30-month term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, was both personally violent against both officers and the Capitol and played a crucial role in facilitating the first breach of the Capitol through such violent acts. In an attempt to break through the defensive line of police dressed in riot gear, Miles shoved and tried to punch officers. He then used a wooden plank to smash in one of the Capitol building's windows, destroying government property and allowing himself and scores of others to unlawfully enter the building. Then, after being arrested, he told several blatant lies to the FBI agents who interviewed him. Other than by pleading guilty, Miles has never

expressed remorse for his criminal conduct. The nature and circumstances of Miles's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 30 months of incarceration.

### B.  Miles' History and Characteristics

The government acknowledges that Miles's personal history and characteristics contain many mitigating factors. He had a tragic childhood, which is detailed in the PSR, *see* PSR ¶¶ 65-73, 86, 88, 90, and Miles's sentencing memorandum, ECF No. 60. He served in the United States Army for four years, earning multiple medals, including a Purple Heart as a result of suffering a gunshot wound as well as seven traumatic brain injuries, all while deployed in Iraq. *See* PSR ¶¶ 79, 94-96. Miles also continues to suffer from multiple mental health issues, some of which are related to his military service, such as PTSD. *See id.* ¶¶ 83-85.

Nevertheless, while Miles's military service is laudable, it renders his conduct on January 6 all the more outrageous. As a former member of the military, who took an oath to defend this country and its laws, Miles was well aware that his actions on January 6, 2021 were not just illegal, but contrary to his oath. His criminal acts in this case are black and white, and egregious.  He knew fighting the police was wrong, and he presumably understood better than most how vulnerable and overwhelmed the police were during the riot. He similarly knew physically breaking into the Capitol by destroying a window was wrong too.   In light of Miles's conduct, his former military service is as aggravating as it is mitigating.   And, even though he played a pivotal role in breaking into the Capitol, Miles' charges and plea already reflect a degree of leniency; for example, he was not charged with or required to plead to an offense that would have carried a higher Guidelines sentencing range (*see below*).

19

Moreover, Miles's crimes on January 6 were not an isolated event in an otherwise law-abiding life. His criminal history contains two prior misdemeanor convictions for Driving Under the Influence of Intoxicants. *Id.* ¶¶ 55-56.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Miles's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, the zero criminal history points that Miles scored on the Guidelines underrepresents his criminal history because it does not include his two prior convictions—one each in 2009 and 2010—for Driving Under the Influence of Intoxicants.

Second, Miles's active engagement with the Proud Boys before and on January 6, 2021,

---

[3]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

should give this Court pause as well. Miles and his fellow Proud Boys did not come to Washington, D.C. to attend the "Stop the Steal" rally; he did not go to the rally or listen to its speeches. Miles did not accept the results of the 2020 presidential election, so on January 6 he dressed in military camouflage, marched on the Capitol, assaulted police, and smashed one of the Capitol windows to enable himself and a horde of other rioters to take over the building. Miles unabashedly fought his own government to try to interfere with the 2020 presidential election. With the 2024 presidential election approaching, a possible rematch on the horizon, and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence Miles in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.       Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of

the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[5]

According to the government's records, so far courts in this district have sentenced approximately 14 defendants who—like Miles—were charged with violations of *both* 18 U.S.C. §§ 111(a)(1) (Assaulting, Resisting, or Impeding Certain Officers) and 1361 (Destruction of

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Government Property) due to their conduct on January 6. Five of those defendants were convicted after trial and thus are not good comparators to Miles, who pleaded guilty. The average sentence for the remaining 9 defendants has been 45.4 months of incarceration, with a high of 72 months (*United States v. Josiah Kenyon*, 21-cr-726-CJN) and a low of 10 months (*United States v. Kaleb Dillard*, 23-cr-49-JMC) (a case where the parties agreed to an erroneous Guidelines calculation, as explained further below). Although all the defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide the most suitable comparisons to the relevant sentencing considerations in this case.

The defendant in *United States v. Jorden Mink*, 21-cr-25 (RDM), provides the closest match to Miles because Mink—like Miles—shattered an exterior Capitol building window, thus creating a breach point through which rioters entered the building. In Mink's case, his destruction of government property occurred while he was resisting police as part of the riotous crowd near the Tunnel on the West Plaza. Mink climbed onto an exterior window ledge armed with a baseball bat, which he used to smash and shatter one of the Capitol building's windows. Mink then entered the Capitol through that window. Once inside, Mink passed government property, including chairs, out the window to other rioters. Mink then exited the Capitol and assaulted officers in the Tunnel by spitting on them, throwing items at them, and repeatedly striking them with a flagpole. Mink was charged with felony violations of 18 U.S.C. §§ 1361, 1512(c)(2), 231(a)(3), 1752(a)(4) and (b)(1)(A), 111(a)(1), and 111(b), but he pleaded guilty via plea agreement only to one felony, 18 U.S.C. 111(b) (Assaulting, Resisting, or Impeding Officers with a Dangerous or Deadly Weapon),

and one misdemeanor, 18 U.S.C. § 641 (Theft of Government Property). Judge Moss sentenced

Mink to 51 months of imprisonment. Mink and Miles share much in common. They both shattered

windows with a dangerous instrument. They both entered the Capitol building, but for relatively

brief periods of time. And they both pleaded guilty via plea agreement. Mink's case contains

several aggravators that are not present for Miles, however. Mink used a weapon to assault the

officers. He stole government property in addition to destroying it. And he qualified as a criminal

history category II. Unlike Miles, however, Mink was not a member of the Proud Boys or any

other extremist group, and Mink did not repeatedly lie to the FBI.

In *United States v. Daniel Scott*, 21-cr-292 (RCL), the defendant—a member of the Proud

Boys who marched to the restricted Capitol grounds with Miles—used his massive physical size

to bulldoze the police line on the West Plaza, knock over two officers, and create the opening that

allowed a flood of rioters, including Miles, to ascend the nearby exterior staircase and reach the

Upper West Terrace for the first time. Scott then urged his fellow Proud Boys to "take the fucking

Capitol." Soon thereafter, Miles and fellow Proud Boy Dominic Pezzola (*see below*) used objects

to smash the windows on either side of the Senate Wing Doors and breach the Capitol. Scott

pleaded guilty via plea agreement to two felonies, violations of 18 U.S.C. §§ 1512(c)(2) and

111(a)(1), and Judge Lamberth sentenced him to 60 months in prison. Like Miles, Scott assaulted

officers and played a crucial role in facilitating the mass breach of the Capitol. Unlike Miles,

however, Scott cooperated with FBI agents.

The case of *United States v. Dominic Pezzola*, 21-cr-175 (TJK), is also instructive—even

though Pezzola, unlike Miles, went to trial and was convicted of multiple different felonies,

including conspiracy to defraud the United States, in violation of 18 U.S.C. § 372, leading Judge

Kelly to sentence him to 120 months in prison—because Pezzola's case illustrates that Miles has already received enormous leniency. As described above, both Pezzola and Miles were Proud Boys who marched with the group of Proud Boys to the Capitol for the purpose of interfering with the certification, knowingly entered the restricted area, and used objects to shatter windows on either side of the Senate Wing Door. As such, Pezzola and Miles both played crucial—and similar—roles in facilitating the first breaches of the Capitol building, which allowed hordes of rioters to enter, exponentially escalated the danger of the January 6 riot, caused the Vice President and Congress to evacuate, halted the certification, and imperiled our democracy. Unlike Pezzola, however, Miles elected to plead guilty. Partially in recognition of the mitigating factors described above, the government extended enormous leniency to Miles by not insisting he plead to Count 3, the violation of 18 U.S.C. § 1361 (Destruction of Government Property), the charge tied to the window breaking. Had the government done so, Miles's Guidelines range of imprisonment would have skyrocketed. A conviction for 18 U.S.C. § 1361 in this context triggers the upward departure provision of U.S.S.G. § 3A1.4 ("Terrorism") because § 1361 is one of the "offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B)," and Miles acted with the intent to "influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct," U.S.S.G. § 3A1.4; 18 U.S.C. § 2332b(g)(5)(B); *see also* Plea Agreement, ECF No. 51 ¶ 6(C). Accordingly, had Miles been convicted of Count 3, his base offense level would have climbed to 32, *see* U.S.S.G. § 3A1.4(a), and his criminal history category would have been increased to VI, *see* U.S.S.G. § 3A1.4(b). Consequently, after applying the three-level reduction for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, Miles's resulting Guidelines range would have been 151-188

months.[6] In determining the appropriate sentence, the Court should recognize that Miles already has received substantial leniency and thus the Court should not vary below the Guidelines here.

This Court has sentenced only two January 6 defendants who pleaded guilty to violations of 18 U.S.C. § 111(a). Neither is a good comparator case for Miles. The government acknowledges that the defendant in *United States v. Kenneth Bonawitz*, 1-23-cr-55 (JMC), committed more egregious assaults than Miles. One of Bonawitz's attacks involved placing an officer in a chokehold and lifting her up by her neck; another injured the victim officer so severely that the officer was forced to retire. After pleading guilty to violating 18 U.S.C. §§ 231(a)(3) and 111(a)(1), Bonawitz gave a media interview in which he disavowed significant portions of the statement of offense to which he swore and spoke pridefully about his criminal conduct. This Court sentenced Bonawitz to 60 months of imprisonment, which was within Bonawitz's Guidelines range of 57-71 months. The government recognizes that while both Bonawitz and Miles are Florida Proud Boys who pleaded guilty to 18 U.S.C. § 111(a)(1) for assaulting officers, registered zero criminal history points, and failed to show remorse, Bonawitz was far more violent against officers than Miles, and Miles's personal history contains far more substantial mitigating factors than Bonawitz's. The government's recommendation here—half of what the Court imposed against Bonawitz—accounts for these differences. As violent as Bonawitz's conduct was, he did not enter the Capitol building, let alone play the instrumental role that Miles did in facilitating the rioters' occupation of the Capitol building and the specific danger to the Vice President, Congress, and democracy.

This sentence pronounced by the Court in its other Section 111(a)(1) case, *United States v. Kaleb Dillard*, 23-cr-49 (JMC), is also not a reliable comparator for Miles. Dillard, a former

---

[6] Judge Kelly applied the U.S.S.G. § 3A1.4 enhancement in *Pezzola*.

Marine, stormed the police line near the Rotunda Door on the east side of the Capitol building and used a metal tool to smash in the window on the door. After other rioters already inside the Capitol pushed open the Rotunda Door from the inside, Dillard then pushed past police to enter the Capitol through that door. Upon entering, Dillard assaulted one of the officers attempting to close the Rotunda Door, grabbing the officer from behind and throwing the officer backwards onto the marble floor. Dillard then repeatedly shoved a second officer away from the doors in an effort to reopen the doors and allow more rioters to enter. The Court sentenced Dillard to 10 months of incarceration, which represented a two-month downward variance from the bottom of the Guidelines range of 12-18 months that Dillard and the government agreed to in his plea agreement. While Dillard's military service and conduct appear similar to Miles, there are several key differences between Dillard's case and Miles's. First, Dillard's Guidelines were wrong. As explained in the government's sentencing memorandum, *see Dillard*, ECF No. 35 at 2, the government mistakenly stipulated to use U.S.S.G. § 2A2.4 (assault) instead of § 2A2.2 (aggravated assault, based on assaultive conduct that involved an intent to commit another felony) as the base offense level. Had the government properly applied the Guidelines, and done so consistently with how such conduct has been adjudicated in other similar January 6 cases, Dillard's Guidelines range of imprisonment would have been 24-30 months, *i.e.* the same as Miles's. Second, while Dillard, like Miles, smashed a Capitol window, Dillard's destruction of government property was not as significant because it did not enable rioters to breach the Capitol; that occurred on the east side because *other rioters* opened the door from the inside. Finally, Dillard presented the Court with a history of charitable works and strong community ties, which Miles has not.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim officer in this case did not suffer bodily injury as a result of Miles's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Miles must pay $2,000 in restitution, which reflects in part the role Miles played in the riot on January 6.[8] Plea Agreement at ¶ 14. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Miles's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 126.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 30 months' incarceration, three years' supervised release, $2,000 in restitution, no fine, and a $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:      */s/ Michael M. Gordon*
MICHAEL M. GORDON
Senior Trial Counsel, Capitol Siege Section
Assistant United States Attorney
Florida Bar No. 1026025
400 N. Tampa St., Suite 3200
Tampa, Florida 33606
michael.gordon3@usdoj.gov
(813) 274-6370